J-A29023-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.D., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.P., MOTHER | : | No. 685 WDA 2024 |

Appeal from the Order Entered May 11, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000170-2022

BEFORE:   OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.:                    **FILED: MARCH 24, 2025**

S.P. ("Mother") appeals from the order imposed terminating her parental rights to her child, C.D., born in December 2020.  We affirm.

Mother and D.D. ("Father") (collectively, "the Parents") have six biological children: Dn.D., born in 2012; D.L.D., born in August 2013; D.D. ("Drl.D.") born in August 2016; Di.D., born in 2015; D.D. ("Drv.D.") born in March 2019, and C.D., born in December 2020 (collectively, "the Children").[1]

---

[1] As two of the Children have the same initials, we clarify that Drl.D.'s matter is docketed in the trial court at CP-02-AP-0000168-2022.  Drv.D.'s matter is at trial docket CP-02-AP-0000169-2022.

As we discuss ***infra***, the trial court also terminated Mother's parental rights as to D.L.D., Drl.D., and Drv.D.  She did not oppose that termination before the trial court.

The trial court terminated Father's parental rights, as well, to D.L.D., Drl.D., and Drv.D., and C.D.  Father appeals, and this panel vacates those termination orders and remands at Superior Court dockets 690 WDA 2024, 691 WDA 2024, 692 WDA 2024, and 693 WDA 2024.

The trial court summarized the extensive factual and procedural history of this matter. *See* Trial Court Opinion, 9/5/24, at 2-10. Although this appeal concerns only the youngest child, C.D., the trial court also terminated Mother's rights to three older children the same day, and we review all the relevant history.

The Allegheny County Children, Youth, and Families Services agency ("CYF") has been involved with this family for twelve years, since 2012 when it received and found valid a general protective services ("GPS") report of intimate partner violence ("IPV"). At that time, Father and Mother had one child, Dn.D. At some point, Dn.D. was adjudicated dependent, was placed in the care of Mother's mother ("Maternal Grandmother"), and "never returned to either parent." Trial Court Opinion, 9/5/24, at 3 (footnote omitted). Maternal Grandmother adopted Dn.D. in 2015.

Meanwhile, CYF initiated dependency proceedings for the Parents' second child, D.L.D., the same year she was born, 2013. CYF continued to have concerns about IPV and parenting skills, and as well as new concerns of the Parents' substance abuse. The trial court dismissed this dependency petition, however, and returned D.L.D. to Mother's care. At that time, Mother had completed an IPV program and worked with a parenting program through Arsenal Family and Children Center ("Arsenal"). Nevertheless, the trial court was concerned "that Mother might resume her relationship with Father when

he was released to the community from his treatment program." *Id*. at 3 (footnote omitted).

The Parents' third child, Di.D. — who is not a part of the instant appeals — was born in 2015. At some time, he was adjudicated dependent and placed with another foster parent, whom Mother identified at the termination hearing as her father. *See* N.T., 5/3/24, at 102. At the time of the underlying termination orders for the other Children, Di.D.'s permanency goal remained reunification.

Drl.D. was born in 2016. "CYF became active with the family again in 2018 and initiated dependency proceedings. The [C]hildren were removed for a brief period,[2] but had returned to Mother's care by the time of the adjudicatory hearing in 2019." Trial Court Opinion, 9/5/24, at 4.

Drv.D. was born in March 2019. That same month, the trial court adjudicated D.L.D., then five years old, and Drl.D., two years old, dependent. The court found

> valid concerns regarding the physical condition of Mother's home, Mother's parenting skills, the children's behavior, and IPV. Mother's home, though not unsafe, was generally messy, often with food on the floor and trash . . . throughout the home. Mother demonstrated little ability to manage the children. Importantly, the court determined that Mother's ineffective parenting contributed directly to the poor physical condition of the home, because many of the problems resulted from the children's poor

---

2 This removal was prompted by D.L.D.'s disclosure of inappropriate touching by Father. However, at the underlying termination hearings, there was no explanation whether there was any investigation or ultimate finding of this disclosure. *See* N.T., 4/19/24, at 120.

behavior. Just as CYF had feared[,] Mother had resumed her relationship with Father and his violence toward her . . . continued. She obtained a Protection from Abuse Order ("PFA") against Father in December 2018, and he had already violated it twice by the time of the dependency adjudication.

*Id*. at 4-5 (unnecessary capitalization and footnotes omitted).

In December 2019, the trial court adjudicated Drv.D., then eight months old, dependent. The court found

that neither parent had resolved the conditions that required the court's supervision regarding the older three siblings. Critically, Mother's poor home management and ineffective parenting resulted in a safety threat to the entire household. [Di.D.], then four years old, and [Drl.D.], then three years old, were unsupervised and caused a fire while Mother attended to D.L.D.[] and [Drv.D.] The general conditions of the home also created a fire hazard. The court concluded that it was essential to address the children's behavior and Mother's parenting ability or placement of the children would become necessary.

. . . By the time of the August 2020 review hearing, the physical conditions of Mother's home had deteriorated to the point that the CYF worker described it as "destroyed." One month later, on September 21, 2020, CYF obtained [emergency custody] and removed the four children from Mother's care following a home visit where the caseworker "found lots of trash, furniture blocking the hallway, damage to the property, [and] diapers and feces on the floor." . . .

Trial Court Opinion, 9/5/24, at 5-6 (unnecessary capitalization and footnotes omitted). CYF placed D.L.D., Drl.D., and Drv.D. with Maternal Grandmother, and they have remained in her care since then. As stated above, Maternal Grandmother had adopted their oldest sibling, Dn.D., five years earlier.

The trial court summarized:

At the November 2020 review hearing the court found that Mother had made no meaningful progress, that the home the children

- 4 -

were removed from was the fourth home that Mother had "destroyed" and that her ongoing inability to establish and maintain structure for the children contributed to the situation.

*Id*. at 6 (unnecessary capitalization and footnote omitted).

C.D., the youngest child and subject of the instant appeal, was born in December 2020. The month following his birth, the trial court dismissed a petition to adjudicate him dependent, finding that "Mother deserved the opportunity to parent him without ongoing supervision from CYF and the court." *Id*. (unnecessary capitalization omitted).

However, in August 2021, when C.D. was eight months old, the trial court granted CYF's second dependency petition.

> [T]he court concluded that the same concerns that existed regarding the older children now also impaired Mother's parenting of C.D. Notably, IPV between Father and Mother had resurfaced as a significant concern. In fact, Mother decided to terminate the PFA order . . . because she desired to reconcile with Father and reside together as a family. Mother's pattern of inability to maintain safe housing conditions had also resurfaced, and the court concluded that none of the concerns identified by the court in March 2019 had been resolved.
>
> . . . At the adjudicatory hearing regarding C.D., the court allowed C.D. to remain in Mother's care, provided that Mother not permit Father to visit C.D. without CYF supervision. Mother immediately violated this requirement, and CYF obtained [emergency custody] just three days after the adjudication. CYF placed C.D. with his current foster parents, where he has resided since . . . .

Trial Court Opinion, 9/5/24, at 6-7 (footnotes and unnecessary capitalization omitted). C.D.'s foster parents were "family friend[s]" of Mother, and C.D. had stayed with them even prior to removal from Mother's care. N.T., 4/19/24, at 172.

Mother obtained a second PFA against Father in 2022, which remained active at the time of the underlying termination hearings. However, Father violated it on November 2, 2022. *See id*. at 130.

On November 14, 2022, CYF filed the underlying petitions to terminate both Parents' parental rights as to C.D., who was almost two years old and had been in care for fourteen months. CYF also filed petitions to terminate the parental rights as to D.L.D., then nine years old; Drl.D., six years old; and Drv.D., three years old. These older three Children had been removed from Mother's care for more than two years.

"By fall of 2023, with [the termination petitions] already pending, the court concluded again that Mother demonstrated only minimal progress, and that the same parenting deficits identified in 2019 still existed." Trial Court Opinion, 9/5/24, at 7 (footnote and unnecessary capitalization omitted).

The trial court conducted hearings on the termination petitions on April 19 and May 3, 2024. By the time of the second hearing, Mother was incarcerated on drug and firearms charges,[3] and she withdrew her challenge to the termination of her rights as to the three older children: D.L.D., Drl.D.,

_____

[3] A search warrant executed at Mother's home produced: "a nine millimeter Glock-style firearm with no serial number, [believed to be] an illegally manufactured firearm[, or] a ghost gun;" a sawed-off Remington 870 shotgun; ammunition; heroin; and a scale and measuring cup with white residue. N.T., 5/3/24, at 20-21. The police detained Mother and two juveniles. At the time of the termination hearings, Mother was awaiting a preliminary hearing.

and Drv.D. Thus, she opposed only termination of her rights as to C.D. We review the witnesses' testimony in detail.

Stacy-Ann Wilson-Williams ("CYF Caseworker"), the assigned CYF caseworker since 2018, testified to the family's history with CYF and both Parents' goals, as summarized above. Generally, Mother's court-ordered goals throughout all the Children's matters were to: obtain stable housing; participate in parenting training, mental health treatment, and IPV counseling; and attend visits with the Children. In October 2023, CYF assessed her housing and found it was "stable." N.T., 4/19/24, at 166. However, since these cases began, Mother had to obtain new housing nine times, as she was often "evicted or asked to move because of the condition" of her home. *Id*. at 184.

CYF Caseworker further testified that Mother had completed parenting programs through Arsenal, as well Wesley Family Services, but did not complete a program with TRAC Services for Children ("TRAC"). *See id*. at 166-68. In 2018, Mother completed IPV counseling through Women's Center and Shelter. However, there was IPV between Mother and Father in November 2022, and CYF did not know the current status of their relationship. *See id*. at 182.

In March 2024 (one month before the termination hearing), Mother began mental health treatment and coached visitation through GSM Therapeutic and Consulting Services ("GSM"). With respect to the supervised

visits at GSM, Mother was initially "canceling those visits." *Id*. at 178. Her current goals with GSM were to address her "inability to effectively parent the [C[hildren," manage the Children, discipline them effectively and appropriately, identify some of the Children's challenges, and create a structured environment for them. *Id*. at 188-89. Previously, Mother was engaged in therapy with Mercy Behavioral Health ("Mercy"), but that ended "a long time" ago. *Id*. at 178. Mother reported she had medication management, but did not sign an updated release, and thus CYF Caseworker could not verity it. CYF still had concerns regarding Mother "not following through with her mental health [goal] and not being consistent." *Id*. at 171.

CYF Caseworker believed there was "enough time for [Mother] to remedy the circumstances that brought [the C]hildren into care," and there were no additional services CYF could offer Mother. *Id*. at 175.

CYF Caseworker testified that Mother did not consistently visit the Children. *See id*. at 170. CYF Caseworker observed one visit in 2023, and "had to redirect [Mother with] respect to supervision of the [C]hildren," as she "was occasionally on her phone." *Id*. at 171. Thus, CYF was still concerned with Mother's lack of supervision of the Children. *Id*. CYF was seeking termination because of Mother's lack of progress, the inconsistencies in her visits, and her failure to consistently follow through with her court-ordered goals. *See id*.

CYF Caseworker further testified that C.D. is "very attached to" his foster parents, and he hugs and kisses them. *See id*. at 175. CYF had no concerns with C.D.'s foster parents, who were a preadoptive resource. *See id*. at 173.

Monica Cwynar ("Cwynar"), a therapist for TRAC, testified that from January through June 2021, she supervised visits between Mother and the Children. At that time, Mother had in her care C.D. and one older child, while Maternal Grandmother had three of the Children in her care. Mother was scheduled to have weekly visits, but ultimately only seventeen visits occurred. Mother's main goals with TRAC concerned parenting and safety.

Cwynar testified that the Children loved Mother and "vied for her attention." N.T., 5/3/24, at 78. Mother "very much love[d] her children but was overwhelmed and had a history of her own traumatic brain injury," and thus "did not always process the needs of things." *Id*. Cwynar stated that Mother was sometimes receptive to TRAC's directives. However, "[s]he felt like the system was very much against her," and was overwhelmed, sometimes yelling or redirecting "in a way that wasn't . . . helpful." *Id*. at 78, 84. Mother "had a lot of . . trauma that was . . . triggered at times in (inaudible) situations with" Maternal Grandmother or the Children. *Id*. at 83.

Additionally, Cywnar testified:

> In . . . May 2021, there was a Childline that occurred from (inaudible) during the visits. [Mother] was in the waiting room[ with] the baby, and we have an area where you can change [*sic*], she didn't want to do that. She was going to let a stranger change her baby because her fingernails were too long, and she didn't seem to understand.

As the visit went on, there were some other things. The baby was not strapped into the carrier. It was sliding. So we addressed that. Sometimes she just wasn't as safety aware as needed. When [we] brought it to her attention, she would become sometimes defensive and aggressive.

*Id*. at 78. TRAC ultimately ended services because Mother missed visits; she "was living further out, and transportation became an issue." *Id*. at 80. She did not successfully complete her services.

Andrea Barcaskey ("Barcaskey"), an employee of Arsenal, testified to the following. She supervised Mother's weekly visits with the Children from February through June 2023. Barcaskey provided parenting instruction, encouragement, redirection, and modeling. Mother missed "a couple" visits. N.T., 4/19/24, at 26. Mother and the Children were excited to see each other, and she interacted and played with the Children. Mother's goals were to "engage with the [C]hildren appropriately, ask age-appropriate questions, interact with them physically as much as she was . . . able,[4] and provide effective, . . . immediate discipline as needed." *Id*. at 29. However, the ability to manage all of the Children together and to "respond quickly and effectively to situations" "seemed challenging for her." *Id*. at 28-29, 35. Additionally, Mother sometimes talked to the Children "about boyfriends and girlfriends and TikTok videos," which was not age appropriate for all of the Children. *Id*. at

---

4 Mother informed Barcaskey that she had been shot and had some physical limitations.

38. Mother completed twelve visits, as recommended by Arsenal. *See id*. at 28.

Genafie McKnight ("McKnight"), a therapist with GSM, testified to the following. Her agency provided parenting coaching and supervised visits to Mother from March 2023 through April 2024. *Id*. at 29, 31. The supervised visits occurred in Mother's home and "went well," and the Children, who had not seen Mother "for a while," were energetic and sought her attention. *Id*. at 30, 38. Mother sometimes prepared lunch for the Children and played with them. Mother "was starting to . . . implement some of the [parenting] skills" taught, such as "using more nurturing tones" and encouraging the Children to "use walking feet [*sic*] in the house[ and] inside voices." *Id*. at 32. Specifically, McKnight had no concerns with Mother's interactions with C.D., and C.D. identified her as "mom." *Id*. at 36. Additionally, Mother had three therapy sessions with GSM. Her "main goal" was to "process[] her childhood trauma and develop[] new skills and [positive] coping mechanisms," where she had developed "a lot of negative" coping mechanisms. *Id*. at 33.

Brie Zarotney, an employee of a Second Chance, testified to the following. Her agency supervised biweekly, two-hour visits from 2020 through the time of the termination hearings. Initially, visits were unsupervised, but in 2021, became supervised. There were periods with no visits scheduled. There were eighty-six total scheduled visits, Mother cancelled or failed to

appear for thirty-two visits, and forty-nine visits occurred. *See id*. at 50. Of those, C.D. attended twenty-six visits. *See id*. at 54.

Joseph Volkay, an employee of a Second Chance, provided services to C.D. and his foster parents. In the two and one-half years that Volkay has visited C.D.'s foster home, he did not have any concerns. C.D. was "doing excellent" in the home, and was "very close" to and attached to his foster parents. *Id*. at 55. C.D. called them "mom" and "daddu." *Id*. at 56. There were no other children in the foster home.

CYF also presented psychologist Terry O'Hara, Psy.D. ("Dr. O'Hara"), as an expert in forensic psychology. He testified to the following. He first evaluated Mother in 2013, diagnosed her with ADHD, and was concerned with a history of IPV, "a history of depression and agitation, psychiatric hospitalization due to depression [*sic*]." N.T., 4/19/24, at 43-44. Mother's "symptoms and vulnerability to domestic violence relationships were [likely] related to her history of family dysfunction and abuse. She also had difficulty sustaining employment at the time." *Id*. at 44. Dr. O'Hara recommended IPV services, "dual diagnosis treatment at Mercy . . . along with psychiatric (indiscernible)[,] in-home services[ for] parenting education, budgeting, [and] appropriate supervision of the children[, and] increased visitation" with the children. *Id*.

Dr. O'Hara again evaluated Mother in 2023. He testified to the following. At that time, Mother "reported being cut off from Social Security disability,"

was not employed, and had no source of income. *Id*. at 46. By the time of her next evaluation in 2024, however, Mother stated she was working for a home health agency. *See id*. at 81. Mother "alleged significant IPV," including physical and emotional abuse, in her relationship with Father, and reported the Children were exposed to physical violence as well. *Id*. at 45. Mother acknowledged: "I know what I did was wrong. I made this mess. I was around [F]ather[,]" and "I kept taking him back." *Id*. at 45, 80. However, "in the same breath," Mother stated, "[CYF was] playing with me" and "not doing their job," and "[t]here was no reason for the [C]hildren to be removed." *Id*. at 57. Mother did not "assum[e] responsibility for her circumstances," and "denied responsibility for her criminal convictions including [a plea] to intimidation of a witness, terroristic threats, [and] another terroristic threats in 2019." *Id*. at 46. Mother had also pleaded guilty to harassment in 2020 and disorderly conduct. Mother acknowledged that the people she associated with "get her into a lot of difficulties at time," and stated she had COVID and scabies, which caused her to miss several visits with the Children. *Id*. at 57. Mother stated she would ask her attorney to provide medication documentation, but Dr. O'Hara did not receive it. Dr. O'Hara's present concerns were similar to those in 2013: IPV and safety issues and Mother's mental health. Dr. O'Hara "was not presented with any evidence that [she] had sufficiently addressed any of the historical concerns" or "the essential issues." *Id*. at 57, 58.

Dr. O'Hara conducted an interactional evaluation of Mother with the Children. Dr. O'Hara reported the following. "There were some supervision issues," including not comforting Drl.D. when she was upset and crying, not checking C.D.'s diaper despite indicating herself that he had soiled himself, and telling D.L.D., "Just act yourself so you can come home," which could have "place[d] an unnecessary stress or burden onto a child." N.T., 4/19/24, at 47-48. When Dr. O'Hara asked Mother about this, Mother replied "she had a new boyfriend who would assist her with the supervision of the [C]hildren[,] as opposed to her trying to make some changes to ensure sufficient supervision." *Id*. at 47.

Dr. O'Hara also conducted an interactional evaluation of Mother and C.D. "[U]pon seeing [M]other, [C.D.] went to her." *Id*. at 59. Mother was affectionate, playful, and engaging with C.D. *See id*. at 60. Nevertheless, C.D. pointed to the door and asked to leave several times, stating, "I want my mom," referring to his foster mother. *Id*. at 59. Mother appropriately tried to distract C.D., by being playful with him, and tickling and engaging him. *See id*. at 84.

Additionally, Dr. O'Hara completed an "interactional" evaluation of C.D. and his foster parents, and found the latter "were appropriate." *Id*. at 51. C.D. hugged and "engaged very well with his foster parents. [C.D.] was happy[,] smiled and laughed[, and] was engaging." *Id*. at 51. The foster parents showed positive parenting skills. C.D.'s foster mother told Dr. O'Hara

that: Mother only attended fifteen percent of visits with C.D.; C.D. had not seen Mother in six weeks; Mother had "a history of threats;" and C.D. "had better behavior overall because he wasn't subject to the . . . chaos of [Mother's] household." *Id*. at 52. Dr. O'Hara opined the foster home would be appropriate long-term resources for C.D. *Id*. at 74.

Dr. O'Hara had concerns with unsupervised contact between Mother and the Children. *See id*. at 54. He opined that he "did not have evidence" that Mother was "in any position to care for a child's needs and welfare," was "complaint with treatment or making progress," or "would be able to make progress in a reasonable amount of time." *Id*. at 58. Dr. O'Hara understood that Mother lacked "consistent visitation with the [C]hildren," and stated it would be "difficult for children to establish a meaningful relationship and secure attachment with a caregiver in the absence of consistent and quality contact." *Id*. at 55.

Dr. O'Hara stated that generally, a child develops a bond or attachment with an adult when they are in a safe, secure, and stable environment, and the child can see the caregiver "as a consistent figure that they can rely on." N.T., 4/19/24, at 66-67. On the other hand, a child is "not able to develop security in environments of instability[ or] lack of safety." *Id*. at 67. When asked if there were a sign of an attachment between C.D. and Mother, Dr. O'Hara replied, "[C.D.] would laugh and engage with her when [Mother] was playful with him, but he also . . . consistently desired to leave the evaluation

room. And he would often say, . . . 'I want my mom,'" referring to his foster mother. *Id*. at 70. On cross-examination, Dr. O'Hara further explained:

[The question of whether C.D. had a secure attachment to Mother is] a little more problematic. [C.D.] did seem to spend much of the evaluation wanting to leave . . . . Now, the question is, why is that the case? According to [the foster mother], there's been a paucity of visitation between the parties. [Mother] acknowledges that she missed several visits due to medical concerns, which I was not able to substantiate.

So there's a possibility that [C.D.'s] performance with [M]other is based on him not having a consistent meaningful relationship with her. There's also a possibility that this is different from how [C.D.] typically encounters [M]other. Usually he's with a multitude siblings. That was not the case this time, and this was a different experience for [C.D.]

He did want his siblings[ and asked for them] on occasion. [Mother] also frequently asked leading questions about that when he was (indiscernible) his foster mother.

And there's also the hypothesis that [C.D.'s] foster mother was in the waiting room. He lives with the foster mother. She's the primary caregiver of him. The evaluation is a new environment. Children typically desire reassurance sometimes when they're in new environments. So I think all three of those hypotheses are possible.

*Id*. at 86-87. Dr. O'Hara opined "there would be some detriment for the [C]hildren if their relationship with [M]other were to be terminated." *Id*. Dr. O'Hara also opined that in the absence of "a strange situation study," he could not "say with certainty" whether C.D. had secure attachments to his foster parents.

Mother testified to the following. When asked why CYF removed C.D. from her care, she stated:

- 16 -

Because [F]ather came back in the picture.

* * * *

I don't really think it was that significant enough to warrant a removal. Basically, we got a PFA dropped, and . . . we were going to try again, so we went to the shelter[.] I really was just like was okay with it because there [were] people there . . . observing us, and they were going to see through housing and help us with everything. And so then we have to be in . . . permanent housing where we can try to get the [Children] back, and I was going to try to work with [Father] since . . . he had a job and everything, and they removed him. So we had to separate and stuff. So I separated from him. They removed my [Children].

N.T., 5/3/24, at 60.

Mother initially attended mental health at Mercy, but her therapist stopped calling her, Mother then learned she no longer worked there, and Mercy placed her "on the waiting list again." *Id*. at 63. Mother completed IPV counseling at the Women's Center and Shelter, who told her she longer needed it because she and Father were "no longer together." *Id*. at 65. The visits with Children, supervised by GSM, were "better than Arsenal," and Mother was learning from GSM. *Id*. at 66-67. Mother has also worked with other in-home services, including for managing money.

Mother stated that visits with C.D. were good. She plays and dances with him to make him feel comfortable. When asked why she missed some visits, Mother responded:

[O]ne day my friend called me out of nowhere. CYF was at her house[ and removing her Children]. I really would like to help people. So I went over there and helped her to try to clean her house, and I caught scabies from cleaning her house with her. .

- 17 -

. . I went to the hospital, . . . but I knew in the back of my head I helped somebody so they didn't remove her kids.

N.T., 5/3/24, at 69.  Mother denied that she sometimes failed to confirm visits or appear for confirmed visits with the Children, stating Maternal Grandmother sometimes her visits or "they didn't have drivers."  *Id*. at 70.

Mother acknowledged that she could not currently care for C.D. because she was in prison, but stated that upon her future release, she could care for him.  *See id*. at 72.  Mother stated that she had the support of friends, her parents, and Father's parents.  *See id*. at 71.  Mother did not have concerns about the care C.D.'s foster parents provided him, but she opposed termination of her parental rights.  *See id*. at 73.

At the conclusion of the second hearing, the trial court entered the underlying order terminating Mother's parental rights to all four Children, under subsections 2511(a)(2), (8), and (b).[5]  Mother filed a timely notice of appeal as to C.D. only, and filed a Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal.

Mother raises the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear

_____

[5] Mother asked if C.D. could have "an open adoption," which would allow post-adoption contact, and the trial court stated it did not oppose it.  N.T., 5/3/24, at 101-02.

- 18 -

and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 5.

In her first issue, Mother argues the trial court erred in terminating her parental rights under subsection 2511(a)(2). We consider the applicable standard of review:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. [We] accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but [we are not] require[d] to accept the [trial] court's inferences or conclusions of law. . . . "We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." However, "[w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence."

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (citations omitted).

> The Pennsylvania Supreme Court has acknowledged

> the significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child. . . . Because of this serious impact attending the termination of parental rights, "'it is important that a judicial decree extinguishing such rights be based solely on competent evidence.'"

*Id*. at 358 (citations omitted).

> This Court has explained:

> Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [section] 2511(a).

Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (citations and unnecessary capitalization omitted and paragraph break added).

Subsection 2511(a)(2) provides that a trial court may terminate parental rights when:

[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). Under this subsection, the petitioner must show:

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

Grounds for termination "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." Further, "[p]arents are required to make diligent

- 20 -

efforts toward the **_reasonably prompt_** assumption of full parental duties."

**_Interest of K.T._**, 324 A.3d at 57 (citations omitted and emphasis in original). We emphasize: "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." **_In re B., N.M._**, 856 A.2d 847, 855 (Pa. Super. 2004). Finally, we note this Court needs only agree with the trial court's decision, as to any one susbsection of 2511(a), in order to affirm the termination of parental rights. **_See In re B.L.W._**, 843 A.2d 380, 384 (Pa. Super. 2004) (_en banc_).

In challenging termination under subsection 2511(a)(2), Mother argues CYF failed to prove she has not remedied, or cannot remedy, the conditions that caused C.D. to be without essential parental care. Mother argues, in sum:

> The conditions that led to the removal and placement of C.D. were that Mother was allegedly allowing Father to have unsupervised contact with C.D., in violation of [an August 2021] court order. CYF failed to prove any repeated incapacity, abuse, neglect, or refusal by Mother. There was no evidence presented at trial that any mental health condition or [IPV] prevented Mother from providing essential care to C.D. There was [an] absence of evidence that Mother lacked the capacity to protect C.D. from others.

> \* \* \* \*

> Mother utilized the services from her mental health treatment at GSM . . . and Mercy . . . and from her [IPV] treatment at the Women's Center and Shelter to remedy the issues that led to the removal of C.D.

Mother's Brief at 21, 22.

In its opinion, the trial court found Mother continued to have "long-standing issues with IPV, adequate parenting skills, and an inability to maintain safe physical conditions of her home." Trial Court Opinion, 9/5/24, at 16. It concluded "[t]he evidence demonstrated that Mother has failed to adequately address her inability to appropriately parent [C.D.] and maintain a safe environment for him." *Id*. at 23. The court reasoned:

> Over the [twelve] years of CYF's involvement, CYF and the court have provided multiple opportunities for Mother to work with services to support and improve her parenting ability. At times, Mother has worked with individuals and programs that she herself identified. At times, Mother has worked with service providers who came to her home to assist with household management and parenting. At times, Mother has attended interactive professional parenting programs where staff worked directly with her and the [C]hildren.

> \* \* \* \*

> Despite participation in all of these services, Mother has continued to struggle to attain a level of parenting ability that could ensure a child's safety. Indeed, the issues that the most recent service providers identified as their focus are essentially the same issues that have persisted throughout the life of the [C]hildren's cases.

> Similarly, services have repeatedly been provided to address Mother's chronic and longstanding experience of IPV in her relationship with Father. Mother has participated in IPV services multiple times over the years, completing services . . . , only to have the IPV issues resurface. Mother's choice to terminate her PFA order in 2021 led directly to C.D.'s dependency adjudication and removal.

> In recent times, it appears that Mother has more successfully avoided interaction with Father, and incidents of IPV have not recurred. Even so, Mother still remains unable to

acknowledge the role her own choices about remaining in a relationship with Father both affected her children and resulted in C.D.'s removal.

Trial Court Opinion, 9/5/24, at 8-10 (footnotes omitted and paragraph break added).

The trial court also considered Dr. O'Hara's testimony:

Dr. O'Hara testified that, based on his most recent set of evaluations, Mother was not in a position to care for [C.D.] In his report, Dr. O'Hara opined that "there would be potential safety issues for [C.D.] if [he] were to have unsupervised contact with . . . Mother, given the lack of evidence that [she] has made any gains in relation to parenting and IPV, and her ongoing engagement in criminal activity."

*Id*. at 23 (footnotes omitted).

After careful review of the record, we determine the record evidence supports the trial court's termination order under subsection 2511(a)(2). ***See***

***In re Adoption of C.M.***, 255 A.3d at 358. We reiterate that C.D. was removed from Mother's care when he was eight months old, CYF filed the termination petition when he was fourteen months old, and the termination hearings were held when he was three years and four months old. By then, C.D. had been placed with his foster parents for two years and seven months. Mother's claim, that there was no evidence showing she lacked the capacity to protect or care for C.D., is belied by the record.

First, we observe Mother does not address at all her permanency goal of obtaining suitable housing. Although Mother currently had stable housing, CYF Caseworker explained that throughout this case, she had to obtain new

housing nine times, often due to the condition of her home. The trial court considered the long-time unsafe conditions of her home, which was caused in part by Mother's inability to manage the Children, and which led to them starting a fire. *See* Trial Court Opinion, 9/5/24, at 5. Second, while Mother avers she completed mental health treatment with Mercy and GSM, we reiterate that CYF Caseworker testified, without dispute, that treatment with Mercy occurred "a long time" ago. N.T., 4/19, 24, at 170. Additionally, Mother began treatment with GSM only one month before the termination hearing.

Third, with respect to IPV counseling, Mother correctly points out that she completed a program with the Women's Center and Shelter in 2018. However, she again ignores the trial court's extensive discussion — that even after this date, she repeatedly resumed her relationship with Father, despite obtaining a PFA against him, and further exposed the Children to domestic violence. Indeed, as the trial court pointed out, in 2021: Mother advised the trial court that she wished to terminate the PFA order and live with Father; and "immediately" after the court adjudicated C.D. dependent, Mother violated the court's prohibition against Father visiting the Children without CYF supervision. Trial Court Opinion, 9/5/24, at 7. Finally, the trial court heard evidence that Mother continued to struggle with managing all of the Children and with practicing appropriate discipline. *See* N.T., 4/19/24, at 26, 188-89.

In rendering its decision, the trial court emphasized the long-time availability of the services to Mother, and her continued inability to achieve

her goals. As stated above, "[p]arents are required to make diligent efforts toward the **reasonably prompt** assumption of full parental duties," and "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform . . . parental responsibilities while others provide the child with his . . . physical and emotional needs." **Interest of K.T.**, 324 A.3d at 57; **see also In re B., N.M.**, 856 A.2d at 855. As we conclude the record supports the trial court's findings, we do not disturb its conclusion that CYF presented clear and convincing that Mother's repeated and continued incapacity has caused C.D. to be without essential parental care or control, and Mother cannot or will not remedy these conditions. **See** 23 Pa.C.S.A. § 2511(a)(2); **see also Interest of K.T.**, 324 A.3d at 56.

Because we agree with the trial court as to subsection 2511(a)(2), we need not reach the merits of Mother's argument pertaining to subsection 2511(a)(8). **See In re B.L.W.**, 843 A.2d at 384.

In her final issue, Mother asserts the trial court abused its discretion in finding CYF presented sufficient evidence for termination under subsection 2511(b). We reiterate that we review a termination decree for an abuse of discretion. **See Interest of K.T.**, 324 A.3d at 56.

Subsection 2511(b) states:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

- 25 -

23 Pa.C.S.A. § 2511(b).

> [A] court conducting the [subs]ection 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

*Interest of K.T.*, 324 A.3d at 55 (citation omitted). "'In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.' The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well." *In re M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019) (citations omitted).

Mother avers the trial court erred in finding CYF presented clear and convincing evidence that termination would best meet C.D.'s developmental, physical, and emotional needs. In support, Mother cites: (1) Dr. O'Hara's testimony that C.D. would suffer a detriment if her rights were terminated, Mother had positive parenting skills, and C.D. showed affection toward her; and (2) Arsenal employee Barcaskey's and GSM therapist McKnight's testimony that they observed positive interactions between Mother and C.D. Mother maintains that she loves C.D., they both benefit from having their relationship, and termination was not in his best interests because it would deprive C.D. of his relationship with Mother and all of his siblings.

- 26 -

In determining CYF met it evidentiary burden under subsection 2511(b), the trial court found that Mother has not maintained consistent visitation with C.D., and thus C.D. "has not had the level of contact with Mother that would have enabled him to develop a secure attachment." Trial Court Opinion, 9/5/24, at 24. The court concluded:

> [T]he evidence . . . supports the court's conclusion that . . . while it is obvious that Mother loves [C.D.] and desires for their relationship to continue, [C.D.] lacks any form of a meaningful relationship, and therefore any bond with Mother, and that he will not suffer extreme emotional consequences from termination of Mother' parental rights. Consequently, the evidence supports the court's ultimate conclusion that termination of Mother's parental rights served [C.D.'s] needs and welfare.

*Id*. at 23. Additionally, the trial court considered Dr. O'Hara's opinion "that children need to be in a 'safe, secure, stable environment . . . with a caregiver who is responsive and nurturing," and who is "a consistent figure that they can rely on." *Id*. at 24. The trial court credited Dr. O'Hara's opinion that here, "there would be limited detriment to [C.D.] should his relationship with Mother be severed." *Id*. (footnote omitted).

The trial court also considered C.D.'s current foster placement:

> Foster parents have provided [a safe, secure, stable] environment for [C.D.] since he was nine months old. Both Dr. O'Hara and . . . CYF [C]aseworker have observed [C.D.] to display signs of a secure attachment to foster parents including directing himself to them and seeking them out for affection. In contrast, [C.D.] repeatedly asked to leave the room during [the] interactional evaluation with Mother while also indicating his desire to return to foster mother. . . .

*Id*.

After careful review of the record, we determine the record evidence supports the trial court's findings and credibility determinations. *See In re Adoption of C.M.*, 255 A.3d at 359. As the trial court stated, Dr. O'Hara noted Mother's "lack of consistent visitation" and opined generally that it is "difficult for children to establish a meaningful relationship and secure attachment with a caregiver in the absence of consistent and quality contact." N.T., 4/191/24, at 55. Dr. O'Hara also opined "there would be some detriment for the [C]hildren if" Mother's rights were terminated. *Id*. The trial court was free to weigh this testimony against all the other relevant evidence presented, including the testimony concerning C.D.'s attachments to his foster family, as well as Mother's own testimony, and conclude that termination would ultimately best serve C.D.'s welfare and physical and emotional needs.[6] *See*

_____

[6] As stated above, this panel vacates and remands the trial court's orders terminating *Father's* parental rights as to D.L.D., Drl.D., Drv.D., and C.D. In that appeal, we conclude that CYF did not meet its evidentiary burden under subsection 2511(b). In support, we emphasize that: Dr. O'Hara did not observe Father, who was incarcerated, interact with the Children; the only witness who observed any visit between Father and the Children was CYF Caseworker, who testified that she observed *one* video visit in 2023, the visit went well, and Father was appropriate; the only evidence about bonds was Father's own, undisputed testimony that he had a bond with each child; and CYF presented *no* evidence as to what effect termination would have on the Children.

The evidence presented as to Father is distinguishable from the evidence pertaining to Mother. As we discuss in detail above: multiple CYF witnesses testified as to their observations of Mother's visits with C.D., as well as their bond; some of these witnesses also provided parenting coaching to Mother; Dr. O'Hara conducted interactional evaluations of Mother with C.D.; and Dr. O'Hara opined that termination would have a slight detrimental effect on C.D.

*Interest of K.T.*, 324 A.3d at 55 (stating that the presence of a parental bond "is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare"). Indeed, on cross-examination, Mother's counsel asked Dr. O'Hara his opinion on whether termination of Mother's parental rights would meet the Children's needs and welfare. *See* N.T., 4/19/24, at 89. Dr. O'Hara responded that he does "not opine on that," and the trial court agreed this conclusion is made by the court after consideration of all the evidence. *Id*. at 89-90.

In light of all the foregoing, we do not disturb the order of the trial court's order terminating Mother's parental rights to C.D.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/24/2025